Tom J. Ferber (tferber@pryorcashman.com)
Jacob B. Radcliff (jradcliff@pryorcashman.com)
PRYOR CASHMAN LLP
7 Times Square
New York, NY 10036-6569
(212) 421-4100
*Attorneys for Defendant*
*Robyn Rihanna Fenty*

Robert Penchina (rpenchina@lskslaw.com)
Amanda Leith (aleith@lskslaw.com)
LEVINE SULLIVAN KOCH & SCHULZ, LLP
321 West 44th Street, Suite 510
New York, NY 10036
(212) 850-6100
(212) 850-6299 (Fax)
*Attorneys for Defendants The Island Def Jam Music Group,*
*a division of UMG Recordings, Inc., and Melina Matsoukas*

Thomas Catalano (tcatalano@lskdnylaw.com)
LESTER, SCHWAB, KATZ AND DWYER, LLP
120 Broadway
New York, NY 10271
(212) 341-4298
*Attorneys for Defendant Black Dog Films, Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

| | | |
|---|---|---|
| DAVID LACHAPELLE, | : | No. 1:11 CV 00945 (SAS)(GWG) |
| | : | |
| *Plaintiff*, | : | |
| | : | |
| v. | : | |
| | : | |
| ROBYN RIHANNA FENTY p/k/a RIHANNA, | : | |
| ISLAND DEF JAM MUSIC GROUP, a | : | |
| Division of UMG RECORDINGS, INC., | : | |
| MELINA MATSOUKAS, and BLACK DOG | : | |
| FILMS, INC. | : | |
| | : | |
| *Defendants*. | : | |

_____

**DEFENDANTS' JOINT MEMORANDUM OF LAW IN SUPPORT**
**OF THEIR MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... ii

FACTS .......................................................................................................................... 1

ARGUMENT ................................................................................................................. 4

    I.   PLAINTIFF'S COPYRIGHT INFRINGEMENT CLAIM SHOULD BE DISMISSED.... 4

        A.  The Court Can Evaluate Plaintiff's Copyright Claims on a Rule 12(b)(6) Motion ....... 4

        B.  The Law Limits The Scope of Protection for Photographs ........................................ 5

        C.  There Is No Actionable Similarity Between
            Any of the Eight Stills and the Video .......................................................................... 8

    II.  PLAINTIFF'S LANHAM ACT CLAIM SHOULD BE DISMISSED ........................... 18

        A.  LaChapelle Has No Protectable Trade Dress ............................................................ 18

        B.  Defendants Made No Trademark Use of Anything Belonging LaChapelle ............... 21

        C.  LaChapelle's Claim is Only Cognizable Under Copyright Law ................................ 23

    III.  PLAINTIFF'S STATE LAW UNFAIR
        COMPETITION CLAIM SHOULD BE DISMISSED ..................................................... 24

## <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>                                                                                     <u>PAGE(s)</u>

*Agence France Press v. Morel,*
    2011 U.S. Dist. LEXIS 5990 (S.D.N.Y. Jan. 14, 2011).................................................23

*Allen v. Scholastic Inc.,*
    739 F. Supp. 2d 642 (S.D.N.Y. 2011)...............................................................................4

*Andersson v. Sony Corp. of America,*
    1997 U.S. Dist. LEXIS 5948 (S.D.N.Y. May 1, 1997)...........................................8, 11, 17

*Ann Howard Designs, L.P. v. Southern Frills, Inc.,*
    992 F. Supp. 688 (S.D.N.Y. 1998) .................................................................................19

*Anti-Monopoly, Inc. v. General Mills Fun Group.,*
    611 F.2d 296 (9th Cir. 1979) .........................................................................................21

*Arnold v. ABC, Inc.,*
    2007 U.S. Dist. LEXIS 5802 (S.D.N.Y. Jan. 29, 2007)..................................................22

*Bill Diodato Photography v. Kate Spade,*
    388 F. Supp. 2d 382 (S.D.N.Y. 2005)..................................................................5, 6, 11, 23

*Briarpatch Ltd. v. Phoenix Pictures, Inc.,*
    373 F.3d 296 (2d Cir. 2004)...........................................................................................24

*Cabell v. Sony Pictures Entertainment, Inc.,*
    714 F. Supp. 2d 452 (S.D.N.Y. 2010)...............................................................................7

*Charles Atlas, Ltd. v. DC Comics, Inc.,*
    112 F. Supp. 2d 330 (S.D.N.Y. 2000).............................................................................22

*Community for Creative Non-Violence v. Reid,*
    490 U.S. 730 (1989).......................................................................................................24

*Computer Associates International, Inc. v. Altai, Inc.,*
    982 F.2d 693 (2d Cir. 1992).....................................................................................24, 25

*Cosmetically Sealed Industries, Inc. v. Chesebrough-Pond's USA Co.,*
    125 F.3d 28 (2d Cir. 1997).............................................................................................22

*Crane v. Poetic Products Ltd.,*
    593 F. Supp. 2d 585 (S.D.N.Y. 2009).............................................................................25

**CASES**                                                                          **PAGE(s)**

*Dastar Corp. v. Twentieth Century Fox Film Corp.*,
    539 U.S. 23 (2003)...................................................................................23

*Franklin Mint Corp. v. National Wildlife Exchange*,
    575 F.2d 62 (2d Cir. 1978)......................................................................8

*Freeplay Music, Inc. v. Cox Radio, Inc.*,
    409 F. Supp. 2d 259 (S.D.N.Y. 2005)...................................................23

*Galerie Furstenberg v. Coffaro*,
    697 F. Supp. 1282 (S.D.N.Y. 1988).......................................................20

*Heller v. Design Within Reach*,
    2009 U.S. Dist. LEXIS 71991 (S.D.N.Y. Aug. 14, 2009)...................15

*Hughes v. Design Look, Inc.*,
    693 F. Supp. 1500 (S.D.N.Y. 1988).......................................................20

*Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*,
    58 F.3d 27 (2d Cir. 1995)......................................................................18

*Kaplan v. Stock Market Photo Agency, Inc.*,
    133 F. Supp. 2d 317 (S.D.N.Y. 2001)..........................................5, 6, 7, 8

*Kerr v. New Yorker Magazine*,
    63 F. Supp. 2d 320 (S.D.N.Y. 1999)................................................7, 11, 14

*Kroencke v. General Motors Corp.*,
    270 F. Supp. 2d 441 (S.D.N.Y. 2003),
    *aff'd without op.*, 99 Fed. Appx. 339 (2d Cir. 2004) ............................4

*Landscape Forms, Inc. v. Columbia Cascade Co.*,
    113 F.3d 373 (2d Cir. 1997)..............................................................18, 20

*Leigh v. Warner Brothers, Inc.*,
    212 F.3d 1210 (11th Cir. 2000) ..........................................................9, 10

*Mannion v. Coors Brewing Co.*,
    377 F. Supp. 2d 444 (S.D.N.Y. 2005).....................................................8

*National Lighting Co. v. Bridge Metal Industries, LLC*,
    601 F. Supp. 2d 556 (S.D.N.Y. 2009)....................................................19

**CASES**                                                                 **PAGE(s)**

*Oliveira v. Frito-Lay, Inc.*,
    251 F.3d 56 (2d Cir. 2001)..................................................................20

*Orange County Choppers, Inc. v. Olaes Enterprises, Inc.*,
    497 F. Supp. 2d 541 (S.D.N.Y. 2007).................................................25

*Oriental Art Printing v. Goldstar Printing Corp.*,
    175 F. Supp. 2d 542 (S.D.N.Y. 2001)...................................................5

*Parker v. Viacom International, Inc.*,
    605 F. Supp. 2d 659 (E.D. Pa. 2009) ............................................21, 22

*Pirone v. MacMillan, Inc.*,
    894 F.2d 579 (2d Cir. 1990)................................................................21

*Psihoyos v. National Geographic Society*,
    409 F. Supp. 2d 268 (S.D.N.Y. 1995)...................................................7

*RBC Nice Bearings, Inc. v. Peer Bearing Co.*,
    676 F. Supp. 2d 9 (D. Conn. 2009)......................................................25

*RDF Media Ltd. v. Fox Broadcasting Co.*,
    372 F. Supp. 2d 556 (C.D. Cal. 2005) .................................................23

*Richard Feiner & Co. v. Larry Harmon Pictures Corp.*,
    38 F. Supp. 2d 276 (S.D.N.Y. 1999)...............................................24, 25

*SLY Magazine, L.L.C. v. Weider Publications L.L.C.*,
    529 F. Supp. 2d 425 (S.D.N.Y. 2007), *aff'd*, 346 Fed. Appx. 721 (2d Cir. 2009) ............24

*Scholastic Inc. v. Speirs*,
    28 F. Supp. 2d 862 (S.D.N.Y. 1998),
    *aff'd without op.,* 199 F.3d 1323 (2d Cir. 1999) .................................19

*Sherwood 48 Assocs. v. Sony Corp. of Am.*,
    76 Fed. Appx. 389 (2d Cir. 2003)........................................................19

*Shevy Custom Wigs v. Aggie Wigs*,
    2006 U.S. Dist. LEXIS 83495 (E.D.N.Y. Nov. 17, 2006)......................19

*Stadt v. Fox News Network LLC*,
    719 F. Supp. 2d 312 (S.D.N.Y. 2010)..................................................25

**CASES**                                                                                                    **PAGE(s)**

*Volkswagen AG v. Dorling Kindersley Publishing, Inc.*,
 614 F. Supp. 2d 793 (E.D. Mich. 2009)...............................................................21

*Yankee Publishing, Inc. v. News America Publishing Inc.*,
 809 F. Supp. 267 (S.D.N.Y. 1992) ....................................................................21

*Yurman Design, Inc. v. PAJ, Inc.*,
 262 F.3d 101 (2d Cir. 2001)................................................................18, 19, 20

**STATUTES**

Fed. R. Civ. P. 12(b)(6)...............................................................................1, 4

15 U.S.C. § 1125(a) ...................................................................................4, 23

17 U.S.C. § 301(a) ........................................................................................24

Defendants Robyn Rihanna Fenty ("Rihanna"), The Island Def Jam Music Group, a division of UMG Recordings, Inc. ("Def Jam"), Melina Matsoukas ("Matsoukas") and Black Dog Films ("BDF") (collectively, "Defendants") respectfully submit this memorandum of law in support of their joint motion, pursuant to Rule 12(b)(6), to dismiss the Amended Complaint of plaintiff David LaChapelle ("LaChapelle" or "Plaintiff") in its entirety.

## FACTS[1]

LaChapelle is "an artist, photographer, and director." (AC ¶ 1). Rihanna is a musical performing artist whose song "S & M" (the "Song") was released on or about January 25, 2011 as part of her most recent album, entitled "Loud."[2] On or about February 1, 2011, a music video of the Song (the "Video")[3], which was directed by Matsoukas and produced by BDF, was released by Def Jam (*Id*. ¶¶ 3-8). The gravamen of the Amended Complaint is that the Video allegedly copies eight separate LaChapelle still photographs (the "Eight Stills"), which were allegedly "prominently published" in six different publications between 1997 and 2010 (*Id*. ¶¶ 25-26, 30).[4] The Amended Complaint alleges that the Video mimics LaChapelle's style and infringes the copyrights in the Eight Stills (*Id*. ¶¶ 32, 35).

*The Video*: The Video, which is referred to throughout the Complaint, is submitted herewith. Defendant offers the following summary for the Court's convenience:

---

[1] For the purpose of this motion only, Defendants rely on Plaintiff's statement of the facts, as set forth in the Amended Complaint ("AC").

[2] The lyrics to the Song are submitted as Exhibit A to the accompanying Declaration of Tom J. Ferber. All references to exhibits are to the same declaration.

[3] A DVD of the Video is submitted as Exhibit C.

[4] The Certificates of Registration for the Eight Stills, which are referenced in ¶ 26 of the Amended Complaint, reveal that the Eight Stills were created in eight different years – the first in 1995 and the last in 2007 (see certificates, submitted as Exhibit B).

The most heavily featured scene (the "Press Scene") depicts Rihanna giving a press conference in which members of the press have rubber ball gags in their mouths.  Members of the press grab Rihanna and immure her behind a clear plastic sheet, where she sings the Song, to which the press corps nod enthusiastically as they take their notes, which reflect unfavorable commentary about Rihanna, as do the headlines which roll by and which are written on her dress. The aggressively edited Video cuts back and forth between the press conference and Rihanna singing in other sexually charged scenes, which are briefly described below.

The first scene (the "Pink Room Scene") depicts a crowned Rihanna in a pink and white striped room with other women who are wearing clothing associated with sadomasochism dancing around a seated man who is wrapped in tape.  The women later bring the man to his feet and dance around him while Rihanna sings.  Rihanna wears a tube top with "CENSORED" written across her chest, and the camera frequently zooms in for close-ups of Rihanna's face.

A second scene (the "Dog Scene") features Rihanna in a beige hat and dress "walking" a collared man on a leash like a dog.  The man, who is fully clothed, is wearing pink and white except for the leather leash Rihanna holds.  Rihanna and the man exit a suburban home onto a manicured lawn, and the man feigns urinating on a fire hydrant like a dog, following which Rihanna plays with him, disciplines him and kisses him – all in his dog-playing role.

A third scene (the "Pink Hood Scene") begins with Rihanna in a blue chair dressed in a pink rubber hood and a matching underwear/bikini outfit with high pink boots.  After eating pink popcorn from a large pink popcorn bucket while singing in the chair, Rihanna gets up and walks over to the partially undressed press members, one of whom is bound with black tape on a mattress on the floor.  Rihanna is portrayed as a dominatrix who menaces the press members.

A fourth scene depicts Rihanna bound in rope from the waist down and crouching on the floor (the "Rope Scene").  The rope extends to what seems to be a pulley on the ceiling out of view, and then back down to Rihanna's bound wrists; this enables her to hoist herself up as she writhes to the Song.  Rihanna wears a white one-piece bodysuit with yellow polka dots.

Another scene (the "Newspaper Scene"), shows Rihanna in a two-piece outfit and yellow "bunny ears," with a variety of newspaper headlines and articles about her as a backdrop, as Rihanna sings "Oh, I love the feeling you bring to me, oh you turn me on/It's exactly what I've been yearning for…."

Yet another scene (the "Office Scene") shows Rihanna in a pink and orange rubber dress, lying on a desk in an office-like environment, with the male members of the press, predominantly dressed in black-and-white suits (one member, a woman, seems to be wearing a bathing suit), with odd additions to their outfits, such as balloon headwear and fright wigs.

Toward the end of the video there are several clips of Rihanna filmed from the shoulders up and closer, eating strawberries with whipped cream, a banana and ice cream in sexually suggestive ways.  The background of these scenes (the "Food Scenes") are alternately pink, purple and red, and Rihanna wears several different hats in them.

The Video cuts back and forth between the scenes while Rihanna sings.  The Video repeatedly returns to the press conference and/or members of the press (Rihanna's relationship with the press is a subject of the video).  Clips of all of the scenes are again shown in rapid sequence before the video concludes with a shot of an exhausted Rihanna, her face adorned with a yellow smiley face over one eye, a black "X" beneath the other eye, various stickers on her body, and a tongue-and-lip logo over her mouth.

_The Amended Complaint_:  Plaintiff asserts three claims for relief.  The first alleges that the Video

infringes his copyrights in the Eight Stills (AC ¶ 40).  The second alleges violations of § 43(a) of

the Lanham Act based on the Video's alleged "exploit[ation]" of LaChappelle's "provocative,

innovative style, without [paying] his fees" (_Id._ ¶ 45).  Plaintiff alleges that the Eight Stills and

"other photographs and videos produced by plaintiff have acquired secondary meaning" (_Id._ ¶

47).  The "other photographs and videos" are not identified.  Plaintiff alleges that his "trade

dress" is comprised of  "highly saturated contrasting colors in elaborately theatrical, often surreal

or kitschy, staged settings with depth of field, and models in highly detailed costumes, makeup

and wigs."  Based on this, he asserts "trade dress infringement and false designation of origin" in

violation of § 43(a) (_Id._ ¶ 48-49, 55).  The third claim asserts a "state-law unfair competition"

claim, which merely realleges the trade dress violation and alleged attempt to trade on

LaChappelle's "goodwill" set forth in the second claim (_Id._ ¶ 61).

## ARGUMENT

### POINT I
### PLAINTIFF'S COPYRIGHT INFRINGEMENT CLAIM SHOULD BE DISMISSED

**A.**     **The Court Can Evaluate Plaintiff's Copyright Claims on a Rule 12(b)(6) Motion**

This Court recently recognized that a copyright infringement claim may be dismissed as a

matter of law on a Rule 12(b)(6) motion.  _See Allen v. Scholastic Inc._, 739 F. Supp. 2d 642

(S.D.N.Y. 2011) (Scheindlin, J.).

Although Plaintiff lumps the Eight Stills together in one claim and alleges that the "Video

is directly derived from and substantially similar to the [Eight Stills]," they are separate works

created over many years (AC ¶¶ 30, 35).  The copyright claim should therefore be treated as

eight claims, with each of the Eight Stills being separately compared to the Video.  _See Kroencke_

_v. General Motors Corp._, 270 F. Supp. 2d 441, 443-44 (S.D.N.Y. 2003)(rejecting copyright

plaintiff's "aggregation" theory of infringement by which she sought to have court find similarity between defendants' illustration and her seven illustrations), *aff'd without op.*, 99 Fed. Appx. 339 (2d Cir. 2004).  The eight alleged infringements range from instances in which there is only similarity in uncopyrightable *ideas*, but where the detailed copyrightable *expression* is dissimilar, to instances of manifest overreaching by LaChapelle, in which – in his "portray[als of] American 'pop' culture" (AC ¶ 12) – he is effectively trying to monopolize an entire subject matter or genre in two different mediums, *i.e.*, still and motion picture formats.

**B.**     **The Law Limits The Scope of Protection for Photographs**

Still photographs are subject to the same limitations on protectible expression as other works – *i.e.*, the copyright in such works protects only the detailed expression of an idea or concept, but not the idea or concept itself.  Protectible elements in a photograph include "posing the subjects, lighting, angle, and evoking certain desired expressions," as well as the selection of film and camera.  *Oriental Art Printing v. Goldstar Printing Corp.*, 175 F. Supp. 2d 542, 546 (S.D.N.Y. 2001); *accord Kaplan v. Stock Mkt. Photo Agency, Inc.*, 133 F. Supp. 2d 317, 323 (S.D.N.Y. 2001).  Only similarity in protectible elements is actionable.  "When similar works resemble each other only in unprotected aspects – for example, when similarities inhere in ideas, which are by definition unprotected, or in expression that is not proprietary to plaintiff – defendant prevails."  *Bill Diodato Photography v. Kate Spade*, 388 F. Supp. 2d 382, 389-90 (S.D.N.Y. 2005) (applying "more discerning" test, extracting unprotectible elements from consideration).  The applicable jurisprudence requires the rejection of LaChapelle's claim that the Video infringes copyrightable elements of the Eight Stills.

For example, in *Bill Diodato Photography*, then-District Judge Chin addressed a claim brought by a photographer who had submitted his photograph to defendant Kate Spade two years

before the latter launched an advertising campaign including a very similar photograph.  The plaintiff's photograph and that in the Kate Spade advertisement contained the same elements: they both depicted the bottom of a ladies' room stall, showing a woman's feet pointed inward, astride the toilet, in stylish pink shoes with criss-crossing straps and a handbag on the floor by her left foot.  388 F. Supp. 2d at 384-385.  Judge Chin noted that the idea of showing a woman sitting on a toilet to showcase shoes may be a "clever one," but that it was hardly unique in "popular culture."  *Id.* at 384, 388.  After a careful comparison of the detailed *expression* of the two photographs, as opposed to the unprotectible *ideas* portrayed, the court dismissed the complaint, finding that the "idea" in the plaintiff's photograph was the "depiction of a woman's feet as she sits on the toilet, used as a striking device to highlight fashion accessories."  *Id.* at 392.  The court found that numerous aspects of the plaintiff's photograph that flowed from its idea were unprotectible because of the *scenes a faire* doctrine.  Thus, "the legs and handbags…framed by the floor and the bathroom walls," "shoot[ing] a photograph of the bottom part of a woman's legs in a bathroom stall or on a toilet," and related elements were all unprotectible.  *Id.*  As Judge Chin recognized, the numerous elements common to the two photographs were merely part of the common "idea"; the photos were not substantially similar in copyrightable expression.

Similarly, *Kaplan v. Stock Market Photo Agency, Inc.*, concerned two photographs, both featuring businessmen, in similar attire, standing on a ledge or rooftop, poised to jump to a car-lined street below.  The court held that the idea of the businessperson contemplating a leap from a tall building was unprotectible and that "the subject matter of the photographs is also rendered unprotectible by the doctrine of *scenes a faire*."  133 F. Supp. 2d 317 at 323.  The court found that the plaintiff, "like other artists before and after him, has chosen to express a

businessperson's frustration with the world by portraying him at the top of a building; his contemplation of a leap from the edge of that building is the necessary sequence of events that follows from the chosen setting." *Id.* Thus, the court concluded that having a subject stand at the top of a tall building, with his shoes partly over the edge of the building or ledge, in a similar pinstriped suit and wing-tip shoes, which were a "businessperson's garb," were all unprotectible. *Id.* at 324-25. Focusing on elements of expression, as opposed to idea, the court noted differences in detail, such as how much of the subject's pant leg was showing, the difference in buildings, roads and vehicles pictured, and that the "background, perspective, lighting, shading, and color" were different, giving different "feels" or "moods." *Id.* at 326-27. The court therefore granted summary judgment dismissing the copyright claim.

In *Cabell v. Sony Pictures Entertainment, Inc.*, 714 F. Supp. 2d 452 (S.D.N.Y. 2010), the plaintiff claimed that an image on the cover of his novel, which depicted a model with "arms outstretched, holding a gold-colored blow dryer in both hands in the manner of a handgun," was infringed by "promotional images" for the movie *You Don't Mess With the Zohan* that featured Adam Sandler, as Zohan, in similar poses. *Id.* at 454-57. The court found no substantial similarity as a matter of law because: the subjects were posed differently; the characters had different hair and clothing; and the backgrounds were different. *Id.* at 460. *See also Psihoyos v. National Geographic Soc'y*, 409 F. Supp. 2d 268, 270, 274 (S.D.N.Y. 1995) (photographs of the same dinosaur fossils not substantially similar); *Kerr v. New Yorker Magazine*, 63 F. Supp. 2d 320, 325 (S.D.N.Y. 1999) (dismissing claim where plaintiff's and defendants' illustrations both depicted man with "Mohawk" haircut, in profile, with Mohawk in shape of Manhattan skyline; noting that details such as dark olive skin, earrings and chain on plaintiff's figure not replicated in defendants' illustration, buildings in skyline were in different order, and comparing "sketchy,

edgy feel" of one to "more serene and thoughtful impression" of other); *Andersson v. Sony Corp. of Am.*, 1997 U.S. Dist. LEXIS 5948, at *8 (S.D.N.Y. May 1, 1997) (defendants had scanned plaintiff's photographs and added or subtracted elements to create "comps," or models, for their advertisements; court denied plaintiff's motion for preliminary injunction, finding that plaintiff could not "monopolize a pose"); *Franklin Mint Corp. v. National Wildlife Exchange*, 575 F.2d 62, 66 (2d Cir. 1978) (while there were "obvious similarities" in the two sketches, there were also "readily apparent dissimilarities…in color, body, attitude, position," etc., to degree that there was no substantial similarity in expression).

Here, there is much less in common—and far greater differences—between the Eight Stills and the Video than there was between the works in *Bill Diodato Photography*, *Kaplan*, *Cabell*, *Psihoyos* or the other cases cited above. Thus, whether viewed as the isolated still images attached to the Amended Complaint, or in its actual video format, the Video is not substantially similar to the protected elements of the Eight Stills as a matter of law.[5]

## C.    There Is No Actionable Similarity Between Any of the Eight Stills and the Video

The principles and methodology of these cases reveal LaChapelle's claim that the Video infringes copyrightable elements of the Eight Stills to be without merit as a matter of law. The Eight Stills and the allegedly corresponding screen shots selected by LaChapelle from the four minute Video are addressed below. As a preliminary matter, however, since the selection of film and camera are among the expressive elements of the Eight Stills (*see Kaplan*, 133 F. Supp. 2d at

---

[5] *Mannion v. Coors Brewing Co.*, 377 F. Supp. 2d 444 (S.D.N.Y. 2005), a case cited by LaChapelle in the parties' pre-motion letters, is not to the contrary. In *Mannion*, the court concluded that a claim of infringement involving a photograph of a professional basketball player and a similar billboard advertisement could not be adjudicated on summary judgment, where, *inter alia*, both photos were stills, and the billboard model had been dressed the same way, posed the same way, and the angle and lighting of the plaintiff's photograph were imitated. Such similarities are absent in the present case.

323), it must be noted that there is a significant *dissimilarity* between the parties' respective works before the particulars of each still and the Video are even examined.

The Eight Stills, by their nature, present posed images frozen in place; the angle, lighting and subject of each image is forever static and unchanging.  In contrast, the Video is a motion picture set to music—moving at a frantic pace, with the camera and subjects constantly in motion, and the lighting, focus and angle of the shots continually changing.  The only thing in common between the Eight Stills and the Video is that they invoke common concepts and types of props associated with S&M practices (i.e., leather- or latex-clad dominatrixes, whips, people in restraints, men on leashes, and the like) but which are given dissimilar expression.

Given the very nature of still photographs, filmed sequences based on a similar idea typically do not bear substantial similarity to the copyrightable aspects of the photograph, as courts have recognized.  For example, in *Leigh v. Warner Brothers*, *Inc*., 212 F.3d 1210 (11th Cir. 2000), the court affirmed the dismissal of a photographer's claim that certain motion picture sequences infringed the copyright in a still photo.  In that case, the photographer who created "the now-famous photograph of the Bird Girl statue in Savannah's Bonaventure Cemetery that appears on the cover of the best-selling novel *Midnight in the Garden of Good and Evil*" asserted copyright infringement claims against a film company that "took photographs and film footage" of a replica of the statue to use to promote a movie based on the book.  *Id*. at 1212, 1213.  The court recognized that "the elements of artistic craft protected by [the photographer's] copyright [are] the selection of lighting, shading, timing, angle and film."  *Id*. at 1215.  While concluding that the issue of substantial similarity between the parties' *still* photos should be left to a jury, the court of appeals held as a matter of law that "the film sequences featuring the Bird Girl statue are not substantially similar to the protected elements of [the plaintiff's] photograph."  *Id*.  In

9

contrast to the plaintiff's still image, the defendant's motion picture had sequences where "the camera pans up," "the camera rotates around the statue," and the camera "captures only the head and shoulders before panning back to show the Bird Girl's torso."   *Id*.  In addition, in one scene, the film showed "a decoration absent from [plaintiff's] photograph."  *Id*.  Moreover, the film sequences were shot in different lighting, and "were not shot in the same section of the Bonaventure Cemetery as [plaintiff's] photograph, so the surrounding gravestones and greenery are different."  *Id*.  Thus, although based on the same concept and showing the identical subject, the court found that the film sequences at issue had "nothing substantial in common with Leigh's photograph except the statue itself."  *Id*. at 1215-16.  Like the works at issue in *Leigh*, the Video is not substantially similar to any copyrightable elements of the Eight Stills.

*"Aristocrats" and the Dog Scene*



Plaintiff's claim that his still "Aristocrats" is infringed by the Dog Scene exemplifies the overreaching nature of Plaintiff's copyright infringement claims.  LaChapelle's still depicts a woman, who is wearing a high-collared, long black dress (the top of which covers her face below her eyes, while the bottom is parted to reveal her right leg) walking a man – who is naked but for scant leather fetish wear – as if he were a dog.[6]  The woman holds a riding crop and the man wears a black leather "officer's" hat, both of which are commonly associated with sadomasochism.  An exotic building features prominently in the background.

---

[6] A high resolution copy of LaChapelle's "Aristocrats" and a copy of the allegedly corresponding Video frame are submitted as Exhibit D.

While the Dog Scene also employs the common sadomasochistic theme of a woman carrying a riding crop and walking a man like a dog (Video at 1:11), this is an unprotectible *scene a faire*.  Far more than the woman-sitting-on-toilet idea in *Bill Diodato Photography*, "it is an idea that has been used often in popular culture."  388 F. Supp. 2d at 384.  Indeed, LaChapelle expressly acknowledges that he is known for portraying "'pop' culture" in his work. (AC ¶ 17.) As in *Andersson*, LaChapelle cannot "monopolize a pose."  1997 U.S. Dist. LEXIS 5948 at *6. Moreover, the expression of this common idea is markedly different.  In the Video, Rihanna is dressed in a beige gown that is low-cut (unlike the woman in Plaintiff's still, her face is fully revealed and her legs are not), and the man on the leash is dressed in a shirt and tie with pink pants and a pink hat, in stark contrast to the nearly naked man in "Aristocrats."  Rihanna and the leashed man go through an extended routine where he acts like a dog on a lawn in front of a suburban home.  It is playful and humorous – the "man-dog" smiles as he "relieves" himself and he and Rihanna play and "kiss" after she disciplines him.  "Aristocrats," which does not share these qualities, is, as the court in *Kerr* said, "edgy." 63 F. Supp. 2d at 322.  LaChapelle's hatless, black leather-clad woman is mysterious and serious, and the man she is "walking" displays no sense of playfulness.  The background is also completely different – urban home versus exotic, official-looking building.  None of the copyrightable elements of Plaintiff's "Aristocrats" – including, *inter alia*, the composition, angle, location, subjects or lighting – is substantially similar to expressive elements in the Dog Scene.

*"Noisy Fame" and the Press Scene*

 

In the Press Scene, Rihanna is wrangled by members of the press onto a stage, and the press members pull a clear plastic sheet over her while she stands on the stage. (Video at 0:12-29.) The plastic sheet is secured to the wall with large x's of black tape, and Rihanna wears a dress with words pasted on it. Plaintiff claims that the Press Scene infringes his still photograph "Noisy Fame"[7] (above left), which depicts singer Whitney Houston and a bodyguard in dark suit and sunglasses, who tries to protect her from paparazzi. "Noisy Fame" is so dissimilar to the Press Scene, however, that it is impossible to discern which protectible elements Plaintiff contends were copied. The most distinguishing features of the Press Scene in the Video – the plastic sheet behind which Rihanna is trapped, her attire, her smile as she sings to the press corps and their nodding to her music in response – have nothing to do with "Noisy Fame." Similarly, Whitney Houston's attire, her bodyguard, the outreached, bare forearms of the photographers, and the other elements of "Noisy Fame" are nowhere in the Press Scene.

*"Dear Doctor, I've Read Your Play" and the Office Scene*



Plaintiff's "Dear Doctor, I've Read Your Play"[8] (above left), features four circus clowns in full costume (with white-based facial makeup, red noses, colorful suspenders and ties, clown pants and shoes or sneakers) crowded around an unconscious Caucasian woman in a short white dress, with a white garter and stockings, and silver shoes and gloves, lying on a hospital gurney

---

[7] A larger, high resolution copy of "Noisy Fame" and a copy of the allegedly corresponding Video frame are submitted as Exhibit E.

[8] A larger, high resolution copy of this photo and a copy of the allegedly corresponding Video frame are submitted as Exhibit F.

in a blue room.  There is a pile of giant red-and-white medicine capsules on the floor to the right, and a part of a child's (or clown's) bicycle is visible.  The four clowns cast extremely prominent shadows on the blue walls of the small room.

The Office Scene features Rihanna lying on an office desk in a pink and orange rubber dress, while six members of the press, most (but not all) of whom are in fright wigs, move frenetically around her as she sings.  (Video at 3:11-3:25.)  There is no similarity between the still and the video scene other than people in brightly colored wigs around a woman in a reclining position.  The Office Scene has no gurney or medicine capsules, which are at the heart of the "doctor" theme in the title of LaChapelle's still; to the contrary, it features the desk, ceiling lights and neutral-colored walls typical of an office setting.  Unlike the woman in "Dear Doctor," Rihanna is not unconscious; she smiles, sings and feigns talking on a blue phone.

"*Girls, Quentin Tarantino" and the Rope Scene*



Plaintiff's still[9] depicts three people: a nude Japanese woman suspended by ropes from a ceiling, with another nude Japanese woman controlling the ropes to lower the woman toward well-known filmmaker Quentin Tarantino, who wears white (with white and black sneakers), is bound in a detailed pattern of black rope, and has a hairpiece evocative of a Samurai warrior. The background of Plaintiff's photo is a yellow and white grid.  The allegedly similar portions of the Rope Scene feature Rihanna kneeling, alone, on the floor in a crouched position, with ropes around her waist that she manipulates through a pulley above her.  (Video at 2:25-33; 3:04-3:10.)

---

[9] A larger, high resolution copy of "Girls, Quentin Tarantino" and a copy of the allegedly corresponding Video frame are submitted as Exhibit G.

13

She is not nude; rather, she is wearing a white bodysuit with yellow polka dots. The background is several shades of pastel colors. *Id.* Other than the uncopyrightable concept of ropes used as restraints, which is a *scene a faire,* there are virtually no similarities between Plaintiff's still and the Rope Scene.

*"Milla's Cherry Bomb" and the Food Scenes*



Plaintiff's claim that scenes in the Video infringe copyrighted elements in "Milla's Cherry Bomb"[10] is also without merit. Plaintiff's still is of a pale blonde white woman, in a red bikini and long red fingerless gloves, with an oversized firecracker with an ignited fuse on her head posing – body directly facing the camera, in front of a blue background. The allegedly similar Food Scenes shows Rihanna, a dark-skinned woman with red hair,[11] in a number of different hats, in front of a variety of colored backgrounds, eating fruit. The frame pictured above shows a head and shoulder shot of Rihanna; she is standing sideways, with her head looking back over her shoulder to the camera. Both the subjects and the compositions of Plaintiff's still and the Food Scenes are decidedly *dissimilar*.

*"Striped Face" from "Witches Story" and the Pink Room Scene*

 

---

[10] A larger, high resolution copy of "Milla's Cherry Bomb" and a copy of the allegedly corresponding Video frame are submitted as Exhibit H.

[11] *See Kerr*, 63 F. Supp. 2d at 322 (noting different complexion, and presence or absence of beard and jewelry, in defendants' illustration).

Plaintiff alleges the Pink Room Scene infringes on his "Striped Face," from his 1995[12] series of stills called "Witches Story."  Plaintiff's still depicts four people: three women in witches' hats (one of whom has a broomstick between her legs) around a naked, apparently male body, lying face down on the floor, wrapped from the shoulders to the ankles in black plastic tape.  The women are positioned in a small, soundstage-like room with pink and white vertically striped wallpaper, and there are two windows at the rear of the soundstage that are filled with black and yellow stripes.  The colors are bright and saturated.

While the Pink Room Scene also features a room with pink and white walls with windows that are filled with black-and-yellow lines, the similarities end there.  (*See* Video at 0:10.)  The frame chosen by Plaintiff depicts two people, in contrast to the four in Plaintiff's still. While the walls in LaChapelle's still have straight vertical stripes, broken by floral illustrations, the walls in the Pink Room Scene are covered in a zebra-like pattern and have no floral element. *Id.*  Significantly, the Pink Room Scene also depicts a man, but rather than being naked, he wears a blue shirt and distinctive orange and yellow pants, he is first standing and is later seated[13] in a chair, facing the camera.  (This man is not visible in the frame in Ex. A to the Amended Complaint.)  *Id.* at 0:17, 0:32.  More importantly, the motion picture camera is focused continuously on Rihanna as she sings and dances, often in close-up shots that are unlike Plaintiff's photo.  (*Id.* at 0:11, 0:37, 0:39.)  Instead of one square room, Rihanna dances primarily

---

[12] http://www.davidlachapelle.com/series/witches-story/.  Defendant requests that the Court take judicial notice of LaChapelle's "Witches Story" series, based on the description on his own web site.  *See Heller v. Design Within Reach*, 2009 U.S. Dist. LEXIS 71991, at *2 (S.D.N.Y. Aug. 14, 2009).  A high-resolution copy of plaintiff's photo and a copy of the allegedly corresponding Video frame are submitted as Exhibit I.

[13] The man in the blue shirt is famous celebrity blogger Perez Hilton, in keeping with the video's theme of critiquing the media's objectification of Rihanna. http://www.mtv.com/news/articles/1657075/rihanna-s-m-perez-hilton.jhtml

at the near end of a long, narrow room and another rectangular one. *Id.* The colors in the Pink

Room scene are far more muted than in Defendant's photo, the carpet and ceiling are completely

different, and at no point in the Video are there any witches, much less witches positioned

around a central, prostrate figure. The male body wrapped in black tape is in an entirely

different position than the man in Plaintiff's still – he is seated, facing the camera, and later,

paraded around while Rihanna and others dance around him. (Video at 0:17; 0:31-33.)

*"Latex"/"Bathing Suits" and the Pink Hood Scene*



Plaintiff's "Latex" still features a white feminine figure in a hot pink latex fetish mask

with openings for only the subject's eyes and mouth.[14] On the tip of her outstretched tongue is a

tiny coffee cup, and the model sits in front of a variegated background containing several shades

of blue. Neither the identity-concealing mask nor the coffee cup in "Latex" appears in the Video.

In the Pink Hood Scene, Rihanna appears in a markedly lighter pink hood which, rather than

hiding her identity, reveals her entire face. She wears bright blue eyeshadow, unlike Plaintiff's

model. Rihanna dances, sings, and eats from a bucketful of pink popcorn, which is

proportionally larger than LaChapelle's miniature coffee cup, by dropping it into her mouth – not

by placing it on the tip of her tongue. Rihanna, while dressed in the light pink outfit, later acts

out a bondage scene in which several members of the press in the corner of a dimly-lit room, in

varying, but limited, states of undress but with their white shirts and dark suits still in evidence.

---

[14] A high resolution copy of the photo and a copy of the allegedly corresponding Video frame are
submitted as Exhibit J.

They are alternatively taped to a wall or wrapped up in tape, lying on a mattress or on the floor, and Rihanna proceeds to menace, kiss and whip them.

Plaintiff claims that this scene also somehow incorporates copyrighted elements of "Bathing Suits," from his "Secretary Story" from 1998.[15]  As the title suggests, "Bathing Suits" features two women – one black and one white – wearing bikinis (and boots), seated at secretarial desks, laughing as they talk on the telephone, while there is a naked man lying on the floor in front of them, bound up with a telephone cord and with a coffee pot on his chest.  There are no similarities of copyrightable expression between "Bathing Suits" and these scenes in the video, other than a person tied up on the floor at one point during the Pink Hood Scene.  (Video at 2:08-2:20.)  In Plaintiff's still, however, the nude, blindfolded man is bound in a telephone cord; in the Pink Hood Scene, the bound person is tied up with black tape, is lying on a mattress instead of the floor, and is not blindfolded at all (he has glasses on).  *Id.*

The Video is not actionably similar to the Eight Stills.  The very fact that Plaintiff's works are stills and the Video is a type of motion picture, set to music, negates substantial similarity.  Moreover, since so many elements of the Eight Stills are unprotectible *scenes a faire*, the "more discerning" test must be applied, and Plaintiff's copyright infringement claims fail this test.  Plaintiff repeatedly does more than impermissibly attempt to "monopolize a pose" (*Andersson*, 1997 U.S. Dist. LEXIS 5948), he is trying to monopolize a whole genre – which he acknowledges is part of American "'pop' culture" (AC ¶ 17) –  in film as well as in still photography.  And in making his overreaching claims of infringement, he ignores the differences that the case law requires be considered.  If the far more similar photographs at issue in *Bill Diodato Photography* and *Kaplan*, or the illustrations in *Kerr*, were not sufficient for cognizable

_____

[15] http://www.davidlachapelle.com/series/secretary-story/.  A high resolution copy of "Bathing Suits" and a copy of the allegedly corresponding Video frame are submitted as Ex. K.

claims of copyright infringement, then it follows *a fortiori* that the Video is not actionably similar to the Eight Stills, or any of them.

## POINT II
## PLAINTIFF'S LANHAM ACT CLAIM SHOULD BE DISMISSED

Plaintiff's second claim alleges that the production and distribution of the Video "constitutes trade dress infringement and false designation of origin" under Section 43(a) of the Lanham Act. *Id*. ¶¶ 45, 55. This claim should be dismissed because the Amended Complaint does not articulate the elements of any protectable trade dress, Defendants made no source-identifying use of anything belonging to LaChapelle, and LaChapelle's claims are cognizable, if at all, only under the Copyright Act.

**A.      LaChapelle Has No Protectable Trade Dress**

A plaintiff claiming trade dress infringement under section 43(a) must prove "(1) that its dress is distinctive and (2) that a likelihood of confusion exists between its product and the defendant's product." *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 31 (2d Cir. 1995). Here, Plaintiff attempts to claim trade dress rights in his entire "body of work," (AC ¶ 53), including *all* of "plaintiff's images," "the LaChapelle Works," and "other [unidentified] photographs and videos produced by plaintiff." *Id*. ¶¶ 46, 47. LaChapelle's assertions fail, as a matter of law, to sufficiently articulate the elements of his alleged "trade dress."

In *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 116-17 (2d Cir. 2001), the Second Circuit made clear that not only must a trade dress plaintiff "articulate the design elements that compose the trade dress," but that a plaintiff may not use the facile approach of describing the "overall look" of the alleged trade dress, and that "*an articulation of the specific elements*" is required. (Emphasis in original); *see, e.g., Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 381 (2d Cir. 1997) ("[F]ocus on the overall look of a product does not permit a

plaintiff to dispense with an articulation of the *specific elements* which comprise its distinct dress" (emphasis added)).  Moreover, a plaintiff must do more than identify which features of its design are distinctive, it must describe "*how* they are distinctive."  *Shevy Custom Wigs v. Aggie Wigs*, 2006 U.S. Dist. LEXIS 83495, at *15 (E.D.N.Y. Nov. 17, 2006) (emphasis in original).

LaChapelle describes the elements comprising his alleged trade dress as "highly saturated contrasting colors in elaborately theatrical, often surreal or kitschy, staged settings . . . and models in highly detailed costumes, makeup and wigs."  AC ¶ 48.  This describes any color picture of any brightly colored set containing two or more models in costume, and does not meet the standard for "'a precise expression of the character and scope of the claimed trade dress,'" as required in this circuit.  *See National Lighting Co. v. Bridge Metal Indus., LLC*, 601 F. Supp. 2d 556, 561 (S.D.N.Y. 2009) (*citing Sherwood 48 Assocs. v. Sony Corp. of Am.*, 76 Fed. Appx. 389 (2d Cir. 2003)).

Moreover, "trade dress protection extends only to those designs that are 'likely to serve *primarily* as a designator of origin of the product.'"  *Ann Howard Designs, L.P. v. Southern Frills, Inc.*, 992 F. Supp. 688, 691 (S.D.N.Y. 1998) (citation omitted; emphasis in original); *see also, e.g., Yurman*, 262 F.3d at 115 (must show "that in the minds of the public, the primary significance of [the design] is to identify the source of the product"); *Scholastic Inc. v. Speirs*, 28 F. Supp. 2d 862, 871 n.5 (S.D.N.Y. 1998) ("Second Circuit precedent 'makes clear that, in order to prevail on a claim for trade dress infringement, a plaintiff must do more than demonstrate that the appearance of its product serves *some* source identifying function.  It must demonstrate that the *primary* purpose behind the design was to identify its product's source.'") (emphasis in original; alterations omitted), *aff'd without op.*, 199 F.3d 1323 (2d Cir. 1999).

LaChapelle does not allege that any of the design elements identified in the Amended Complaint (*i.e.,* highly saturated, contrasting colors) was included in any of his work for the purpose of identifying him as the source of the work. These elements do not designate the *source* of LaChapelle's art; they *are* his art. This is the method by which he "portray[s] American 'pop' culture." *Id.* ¶ 17. Nothing in the Amended Complaint indicates that any one of these attributes was included for any reason other than to convey LaChapelle's artistic vision. To recognize these artistic ideas as protectable trade dress would mean that no other photographer could create and sell photos of colorful theatrical sets containing two or more costumed models, for example. *See Landscape Forms, Inc.*, 113 F.3d at 382 ("If the law protected style at such a level of abstraction, Braque might have prevented Picasso from selling cubist paintings in the United States.").

Trade dress law simply does not protect an "innovative style" (AC ¶ 45), notwithstanding its allegedly "distinctive" or "unique" nature. *See*, *e.g.*, *Yurman*, 262 F.3d at 117 (rejecting concept of trade dress "for an unprotectible style"); *Hughes v. Design Look, Inc.*, 693 F. Supp. 1500, 1505-06 (S.D.N.Y. 1988) (finding no trademark rights in paintings of Andy Warhol); *Galerie Furstenberg v. Coffaro*, 697 F. Supp. 1282, 1289-90 (S.D.N.Y. 1988) (no trade dress protection for Salvador Dali's artistic style, despite argument that "it is not Dali's signature that sets his artwork apart from similar creations by other artists, but rather his unique style and interpretation"); *accord Oliveira v. Frito-Lay, Inc.*, 251 F.3d 56 (2d Cir. 2001) (no trademark rights in "signature" musical performance). The law simply does not recognize trade dress protection for the "style" of an artist.

Moreover, LaChapelle's assertion that his trade dress consists of his total body of artistic work simply does not meet the standards needed to state a Lanham Act claim. *See, e.g., Yurman*,

262 F.3d at 116 ("trade dress protection for an entire product line" available only "by establishing that the 'overall look' in each separate product is 'consistent.'").  Here, there is no consistent source-denoting look across the Eight Stills, much less across the hundreds or thousands of unidentified photos and videos comprising the full body of LaChapelle's work.

**B.**   **Defendants Made No Trademark Use of Anything Belonging LaChapelle**

Even assuming LaChapelle had protectable trademarks or trade dress, courts have made clear that not every unauthorized use is actionable.  Rather, the Lanham Act is concerned only where a defendant has employed a plaintiff's mark as a designation of the source of defendant's own goods or services.  *See, e.g., Anti-Monopoly, Inc. v. General Mills Fun Grp.*, 611 F.2d 296, 301 (9th Cir. 1979) ("It is the source-denoting function which trademark laws protect, and nothing more.").  "If a defendant uses a trademark in a non-trademark way, the laws of trademark infringement and false designation are not implicated."  *Volkswagen AG v. Dorling Kindersley Publ'g, Inc.*, 614 F. Supp. 2d 793, 808-09 (E.D. Mich. 2009).  And, "[i]f the context or manner of the use does not suggest that the trademark is being used to indicate source or origin of publication, there will be no consumer confusion."  *Yankee Publ'g, Inc. v. News Am. Publ'g Inc.*, 809 F. Supp. 267, 273 (S.D.N.Y. 1992); *see also, e.g., Pirone v. MacMillan, Inc.*, 894 F.2d 579, 583 (2d Cir. 1990) ("Whatever rights [plaintiff] may have in the mark 'Babe Ruth,' [defendants'] use of Ruth's name and photographs can infringe those rights only if that use was a 'trademark use,' that is, one indicating source or origin.").

Here, the Video does not use the Eight Stills or anything else belonging to LaChapelle to denote the source of the Video.  Rather, LaChapelle complains that eight screen shots from a four minute Video are similar to eight photographs he has taken during his career.  This simply is not actionable.  In *Parker v. Viacom Int'l, Inc.*, 605 F. Supp. 2d 659 (E.D. Pa. 2009), the plaintiff asserted that the television show *The Pick Up Artist* ("TPUA") amounted to a false designation

of origin under the Lanham Act because the show used the term "pivot" in connection with dating advice in the same manner for which plaintiff had coined the term as a trademark for his own "seduction services."  The court rejected this claim, among other reasons, because plaintiff's mark was used by defendant as *part* of the challenged show, not to designate the source of origin of that show: "Plaintiff's term 'pivot' is a component part of TPUA, but not the 'origin of good or service' itself.  Accordingly, because Defendant's production of TPUA is the 'origin of the good' at issue, rather than Plaintiff's term 'pivot,' Plaintiff failed to satisfy the false designation of origin element."  *Id.* at 666; *see, e.g.*, *Charles Atlas, Ltd. v. DC Comics, Inc.*, 112 F. Supp. 2d 330, 338 (S.D.N.Y. 2000) ("DC used plaintiff's comic ad not to advance a competing product, but . . . to convey an idea through a literary/artistic work").

Likewise, here the challenged depictions are components of the Video, but they do not designate its source.  Rather, the Video's source is clearly identified in the Video's credits.  *See* Ferber Dec. Exs. C, L (identifying, *inter alia*, Rihanna, Matsoukas, Island Def Jam Music and Universal Music).  Thus, as the Second Circuit has observed, "[t]he non-trademark use of the challenged phrase and the defendants' good faith are both evidenced by the fact that the source of the defendants' product is clearly identified by the prominent display of the defendants' own trademarks."  *Cosmetically Sealed Indus., Inc. v. Chesebrough-Pond's USA Co.*, 125 F.3d 28, 30 (2d Cir. 1997); *see also*, *e.g.*, *Arnold v. ABC, Inc.*, 2007 U.S. Dist. LEXIS 5802, at *9-10 (S.D.N.Y. Jan. 29, 2007) ("[T[he identity of [the] show, and the fact that the show's source is ABC and not plaintiff, is clearly evidenced by the prominent display of the show's title, ABC's own famous and recognizable trademark, and large photos of the show's three stars.").  Because Defendants did not use the Photos to designate a source, Defendants could not have violated the Lanham Act.

**C.      LaChapelle's Claim is Only Cognizable Under Copyright Law**

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), "prohibits false designation of the

origin of goods in interstate commerce and protects only 'the producer of *the tangible goods* that

are offered for sale, and *not* [ ] *the author* of any idea, concept or communication embodied in

those goods.'"  *Bill Diodato Photography*, 388 F. Supp. 2d at 395 (emphasis added) (quoting

*Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 29 (2003)).

LaChapelle's Lanham Act claim is based on the same conduct as his copyright claim—

namely, that the Video allegedly "copied, reproduced and imitated the trade dress of the

LaChapelle Works in connection with the Video."  AC ¶ 51.  But, the Supreme Court has made

clear that such conduct is governed only by copyright laws, not the Lanham Act.  *See Dastar*,

539 U.S. at 31 (rejecting claim that "in marketing and selling [a video] as its own product

without acknowledging its nearly wholesale reliance on the Crusade television series, Dastar has

made a 'false designation of origin'").  The Court held that "as used in the Lanham Act, the

phrase 'origin of goods' is . . . incapable of connoting the person or entity that originated the

ideas or communications that 'goods' embody or contain," *id*. at 32, and thus allowing a claim

similar to LaChapelle's here "would create a species of mutant copyright law."  *Id*. at 34; *see*

*also, e.g., Agence France Press v. Morel*, 2011 U.S. Dist. LEXIS 5990, at *27-28 (S.D.N.Y. Jan.

14, 2011) ("In *Dastar*, the Supreme Court admonished that section 43(a) of the Lanham Act . . .

cannot be invoked as an end run around copyright laws or to add another layer of protection to

copyright holders" and "*[b]ecause photographs are 'communicative products' protected by*

*copyright, false designation of their authorship is not cognizable* under sections 43(a)(1)(A) after

*Dastar*.") (emphasis added); *Freeplay Music, Inc. v. Cox Radio, Inc.*, 409 F. Supp. 259, 263

(S.D.N.Y. 2005) ("The right to copy creative works, with or without attribution, is the domain of

copyright, not of trademark or unfair competition."); *RDF Media Ltd. v. Fox Broad. Co.*, 372 F.

Supp. 2d 556, 562 (C.D. Cal. 2005) (relying on *Dastar* to reject trade dress protection for "total image and appearance" of party's work). Notwithstanding that, as demonstrated above, LaChapelle does not have a viable copyright claim, as a matter of well-established law, a Copyright Act claim is the only cause of action available to address the Video's alleged reproduction of LaChapelle's work and style.

## POINT III
## PLAINTIFF'S STATE LAW UNFAIR
## COMPETITION CLAIM SHOULD BE DISMISSED

Plaintiff's unfair competition claim is barred for the same reasons that LaChapelle's Lanham Act claim is fatally defective. As courts have made clear, "the standard for federal mark infringement and unfair competition is virtually identical to that under New York common law," and thus "[b]ecause plaintiff's claims fail under the Lanham Act, these claims necessarily also fail under New York common law." *SLY Magazine, L.L.C. v. Weider Publ'ns L.L.C.*, 529 F. Supp. 2d 425, 443 (S.D.N.Y. 2007), *aff'd*, 346 Fed. Appx. 721 (2d Cir. 2009). Moreover, this claim is preempted by the federal copyright law.

Section 301 of the Copyright Act expressly reserves to Congress the field of regulation over claims relating to works of authorship which claims seek to vindicate rights equivalent to those provided by the copyright law. *See* 17 U.S.C. § 301(a); *see also, e.g.*, *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 740 (1989) (Copyright Act creates uniform law "by broadly pre-empting state statutory and common-law copyright regulation").

Generally, a claim is preempted unless it includes an extra element that makes it "qualitatively different from a copyright infringement claim." *Briarpatch Ltd. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 305-06 (2d Cir. 2004). The "'extra element'" must be something in addition "'to the acts of reproduction, performance, distribution or display.'" *Computer Assocs.*

24

*Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 716 (2d Cir. 1992) (citation & quotation omitted). Moreover, "[t]he Second Circuit takes 'a restrictive view' of the extra elements that transfer an otherwise equivalent claim into one that is qualitatively different from a copyright infringement claim." *RBC Nice Bearings, Inc. v. Peer Bearing Co.*, 676 F. Supp. 2d 9, 34 (D. Conn. 2009).

LaChapelle's unfair competition claim is based on the identical conduct giving rise to his copyright claim – indeed, his state-law claim expressly incorporates the facts pleaded in his copyright claim (AC ¶ 60) – and presents no extra elements. This claim is directed at Defendants' alleged unauthorized reproduction and use of LaChapelle's artistic works and is preempted. In *Orange County Choppers, Inc. v. Olaes Enters., Inc.*, 497 F. Supp. 2d 541 (S.D.N.Y. 2007), the plaintiff contended that the defendant's unauthorized copying and use of plaintiff's designs, violated New York's unfair competition law. Finding that claim to be preempted by copyright law, the court stated that: "It is axiomatic that unfair competition . . . claims grounded solely in the copying of a plaintiff's protected expression are preempted by [the Copyright Act]." *Id.* at 556 (citation & quotation omitted; alteration in original); *see, e.g., Crane v. Poetic Prods. Ltd.*, 593 F. Supp. 2d 585, 598-99 (S.D.N.Y. 2009) (common law unfair competition claim preempted); *Stadt v. Fox News Network LLC*, 719 F. Supp. 2d 312, 322 (S.D.N.Y. 2010) (unfair competition claim preempted); *Richard Feiner & Co. v. Larry Harmon Pictures Corp.*, 38 F. Supp. 2d 276, 280 (S.D.N.Y. 1999) ("the New York common law of unfair competition requires no element other than those necessary to establish a copyright infringement claim."). The result should be no different here.

Dated: April 29, 2011
       New York, NY

Respectfully submitted,

/s/Tom J. Ferber
Tom J. Ferber
Jacob B. Radcliff
PRYOR CASHMAN LLP
7 Times Square
New York, NY 10036
(212) 421-4100
(212) 326-0806 (Fax)

*Attorneys for Defendant Robyn Rihanna Fenty*

/s/Robert Penchina
Robert Penchina
Amanda Leith
LEVINE SULLIVAN KOCH & SCHULZ, LLP
321 West 44th Street, Suite 510
New York, NY 10036
(212) 850-6100
(212) 850-6299 (Fax)

*Attorneys for Defendants The Island Def Jam Music
Group, a division of UMG Recordings, Inc., and
Melina Matsoukas*

/s/Thomas Catalano
Thomas Catalano
LESTER, SCHWAB, KATZ AND DWYER, LLP
120 Broadway
New York, NY 10271
(212) 341-4298

*Attorneys for Defendant Black Dog Films, Inc.*

26